IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| AMANDA WISE, | ) | CV 09-137-M-DWM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| RICHARD RUST, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.  Introduction

This motor vehicle tort action comes before the Court on three distinct

motions for summary judgment and two separate motions in limine.  Plaintiff

moves for partial summary judgment on the issue of Defendant's liability.  She

also filed an interrelated motion in limine to exclude evidence of her alcohol

consumption.  Defendant seeks partial summary judgment regarding Plaintiff's

shoulder surgeries and alleged brain injury.  Defendant also filed an interrelated

motion in limine to exclude Plaintiff's treating physician from testifying about

1

Plaintiff's shoulder injury and surgeries.  For the reasons that follow, Plaintiff is entitled to summary judgment on the issue of liability, but her motion in limine is denied.  At the same time, Defendant is entitled to summary judgment on Plaintiff's brain injury claim, his motion for summary judgment regarding shoulder injuries is granted in part and denied in part, and his motion in limine prevails.

## II.  Background

At approximately 5:15 p.m. on June 15, 2007, Plaintiff Amanda Wise ("Wise") was driving westbound on Montana Highway 2 near Happy's Inn.  SGI ¶ 1 (dkt #26).  At the same time, Defendant Richard Rust ("Rust") was exiting the Happy's Inn parking lot and turning left onto Highway 2 West.  Id.  Rust apparently did not see Wise's vehicle approaching from the east and, consequently, Wise's vehicle collided with Rust's vehicle, resulting in injuries to Wise.  Id. at ¶ 5.  At the time of the accident, Renae Erickson and her infant son were passengers in Wise's vehicle and Rust's wife was a passenger in his vehicle. Id. at ¶ 50 (dkt #26).

In September 2008, Wise brought this negligence action against Rust in Montana's Lincoln County District Court.  Wise's primary allegation is that Rust was negligent when entering the highway, and she claims to have suffered head,

shoulder and spinal injuries as a result, in addition to pain and suffering.  She seeks over $50,000 in medical expenses and $650,000 in general damages.  In response to Wise's allegations, Rust answers that Wise's alcohol consumption was a contributing cause of the accident.  Id. at ¶ 5.  Rust also argues that the evidence fails to show that Wise suffered a brain injury as a result of the accident, or that her shoulder surgeries were necessitated by the accident.  In September 2009, Rust removed the action to this Court based on diversity jurisdiction.  The timing of removal was not questioned.

Before the Court are (1) Plaintiff's Motion in Limine regarding evidence of her intoxication (dkt #21), (2) Plaintiff's Motion for Summary Judgment as to Liability (dkt #13), (3) Defendant's Motion in Limine to Exclude Testimony by Dr. Knecht concerning Wise's shoulder surgeries (dkt #23), (4) Defendant's Motion for Summary Judgment Re: Plaintiff's Shoulder Injury and Shoulder Surgeries (dkt #15), and (5) Defendant's Motion for Summary Judgment Re: Traumatic Brain Injury (dkt #18).

Wise's motion in limine seeks to exclude any evidence related to her intoxication as irrelevant or otherwise inadmissible.  Because the Court can only consider admissible evidence when addressing Wise's related summary judgment motion on liability, the two motions are discussed sequentially.  Rust's motion in

limine, which seeks to limit Wise's treating physician from testifying about her shoulder surgeries, is similarly related to his motion for summary judgment on Wise's shoulder surgeries. These two motions are also considered in tandem. Rust's motion for summary judgment on the brain injury is distinct from the other motions, so it is addressed separately. The facts pertaining to liability, the shoulder surgeries and the brain injury are set forth below under the respective heading.

### III.  Legal Standards

Summary judgement is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgement as a matter of law." Fed.R.Civ.P. 56(c)(2). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). Once this burden is met, the opposing party must, by affidavits or otherwise, set forth specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e)(2). The opposing party "may not rely merely on allegations or denials in its own pleading." <u>Id.</u> If there is no genuine issue of material fact, the court must determine whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56 (c).

To prove negligence under Montana law,[1] a plaintiff must prove the following elements: (1) the defendant owed a duty, (2) the defendant breached that duty, (3) the breach caused injury to the plaintiff, and (4) damages resulted. Peterson v. Eichhorn, 189 P.3d, ¶ 23008).  If a plaintiff fails to offer proof on any one of the four elements of negligence, then summary judgment in favor of the defendant is proper.  Id.

A district court "may only consider admissible evidence in ruling on a motion for summary judgment."  Ballen v. City of Redmond, 466 F.3d 736, 745 (9th Cir. 2006).  "Evidentiary rulings made in the context of summary judgment motions are reviewed for an abuse of discretion," and "can only be reversed if it was both 'manifestly erroneous and prejudicial.' "  Id. (quoting Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002)).

A district court's ruling on a motion in limine is also reviewed for an abuse of discretion.  United States v. Ross, 299 F.3d 1130, 1138 (9th Cir. 2002).  To reverse on the basis of an erroneous evidentiary ruling, the appellate court must conclude not only that the district court abused its discretion, but also that the error was prejudicial.  Tritchler v. County of Lake, 358 F.3d 1150, 1155 (9th Cir.

---

[1] Because this case is before the Court through diversity jurisdiction, the Court applies Montana substantive law.  See Allstate Ins. Co. v. Hughes, 358 F.3d 1089, 1094 (9th Cir. 2004).

2004).

## IV.  Analysis

**A.**   **Liability**

**1.  Facts**

At the scene of the accident, Montana Highway Patrol Trooper Bryce Ford ("Trooper Ford") inspected the inside of Wise's vehicle and observed "several" open bottles of beer and a partial box of full beer bottles.  SGI ¶¶ 30, 33 (dkt #26). He further observed an open bottle of beer that had spilled on the driver's side floor.  Id.  One witness testified that she could smell alcohol on Wise's breath.  Id. at ¶ 57.  Trooper Ford's initial accident report listed alcohol consumption as a contributing circumstance to the accident.  Id. at ¶ 30.  Trooper Ford later testified under oath, however, that Rust alone was at fault for the collision and Wise's intoxication was not a contributing factor.  SUF ¶ 6 (dkt #49).  A witness who observed the accident also testified that Wise could not have avoided Rust's vehicle.  Id. at ¶ 5.  Wise's expert witness, an accident reconstructionist, concluded that Rust was the sole cause of the collision.  Id. at ¶ 7.  He also found though that Wise's reaction time was slower than could be expected.[2]

---

[2]It is unclear, exactly, what the expert's findings are regarding Wise's reaction time.  The report states:

Wise actually locked up her brakes approximately 2.0 seconds after Mr. Rust first began

Approximately 90 minutes after the accident, Wise submitted to a blood test at Kalispell Regional Medical Center.  Id. at ¶ 41.  The test revealed a blood alcohol concentration of .259, over three times the legal limit.  Id. at ¶¶ 41-42. Wise has testified that a person should not drive with a blood alcohol concentration of .259, and that it would be negligent for her to drive in that condition.  SGI ¶¶ 21-22 (dkt #26).  Rust's expert witness, a toxicologist, concluded that Wise's blood alcohol level–which he calculated to fall somewhere in the range of .220 and .290 at the time of the accident–diminished her ability to drive.  SGI ¶¶ 43, 46-48 (dkt #26).

Although Wise admits that she had been drinking on the day of the accident, she moves the Court to exclude any evidence of her alcohol consumption.  In addition to this blanket exclusion, Wise seeks to exclude (1) evidence of her blood alcohol content, (2) evidence of her DUI citation, (3) any reference to the

---

crossing onto the highway.  A typical perception-reaction-lockup time is 1.3 seconds for a 50th percentile driver.  Thus Ms. Wise reacted approximately .7 seconds after the nose of Mr. Rust's vehicle first entered the highway.  Our calculations show that this is approximately the moment when Mr. Rust's right front wheel crossed the eastbound fog line.  Thus Ms. Wise perceived that she had an emergency situation and needed to swerve and lock up the brakes as quickly as could be expected for a typical driver.

Lee Report 3-4 (dkt #49-4) (citation omitted).  The expert thus suggests that Wise's reaction time of 2.0 seconds was slower than the typical time of 1.3 seconds, yet he concludes that she reacted "as quickly as could be expected for a typical driver."  No explanation is given for this discrepancy.  Insofar as the Court views the report in the light most favorable to Rust, the Court resolves this apparent ambiguity in his favor.

information contained in Trooper Ford's accident report, and (4) any reference to, or photos of, the beer bottles found in her vehicle.  Id.  Wise also moves for summary judgment on the issue of liability, arguing Rust's negligence is the sole cause of the accident.

## 2. Wise's Motion in Limine

### a. Evidence of Alcohol Consumption

Wise maintains that evidence of her alcohol consumption should be "excluded as irrelevant . . . because there [is] no evidence linking alcohol consumption with the cause of the accident."  In support, Wise relies on Montana case law, but her reliance is misplaced because federal law, not state law, governs the admissibility of evidence in diversity cases.  Primiano v. Cook, __F.3d__, 2010 WL 1660303 at *3 (9th Cir. Apr. 27, 2010).[3]

The Federal Rules of evidence apply in diversity negligence actions when determining whether alcohol consumption is relevant or overly prejudicial.  Romine v. Parman, 831 F.2d 944, 945 (10th Cir. 1987).

---

[3] The only authority Wise cites in support of her contention that state law controls is an unpublished Ninth Circuit opinion.  Pl.'s Reply Br. Support Mot. in Limine 3-4 (dkt #42) (citing Segner v. Gladsjo, 944 F.2d 909 (table), 1991 U.S. App. Lexis 22500 (9th Cir. 1991)).  In Segner, the Ninth Circuit remanded the case to the district court for the limited purpose of determining whether blood alcohol content evidence was admissible under state law.  The Ninth Circuit did not analyze whether state or federal law controlled because the appellant failed to raise her "choice of law argument" in district court.

In <u>Romine</u>, plaintiff was injured when her vehicle collided with defendant's vehicle. 831 F.2d at 944. The defendant raised comparative negligence as an affirmative defense because evidence indicated that the driver of plaintiff's vehicle had consumed "some beer" on the day of the accident. <u>Id.</u> at 944-45. Applying the Federal Rules of Evidence, the district court admitted evidence of the driver's alcohol consumption because the "jury was entitled to know the circumstances of the accident." <u>Id.</u> at 945. On appeal, the Tenth Circuit affirmed and held that the "evidence was relevant to the question of [the driver's] reflexes, reaction time, and overall ability to drive the car at the time the accident occurred." <u>Id.</u> (citations omitted).

The Eighth Circuit made a similar finding. In <u>Miles v. General Motors,</u> plaintiff was injured after his motorcycle collided with a vehicle manufactured by defendant. 262 F.3d at 721. Multiple eyewitnesses testified that "they could smell alcohol on [plaintiff's] breath," and plaintiff admitted that "he had consumed at least a portion of two beers before the accident." <u>Id.</u> at 723. Applying the Federal Rules of Evidence, the district court admitted the evidence of alcohol consumption "because [defendant] had raised comparative fault as an affirmative defense." <u>Id.</u> at 722. On appeal, the Eighth Circuit affirmed and held that "[plaintiff's] alcohol consumption was relevant to the question of whether [he] contributed to the

9

accident."  Id. at 723.

Here, Rust has asserted an affirmative defense that Wise's claim is barred or proportionately diminished based on her comparative negligence.  Wise's alcohol consumption is relevant to the defense.  Wise admits that she would be negligent if she drove with a blood alcohol level of .259, Trooper Ford initially listed her alcohol consumption as a contributing circumstance, and Rust's toxicologist testified that Wise's intoxication diminished her reflexes and ability to drive.  Moreover, Wise's own expert found that Wise's reaction time was below average.  Collectively, these facts indicate that Wise's blood alcohol content may have contributed to her injuries.  Accordingly, evidence of Wise's intoxication is relevant for the jury to consider when determining if Wise contributed to the accident.[4]

### b.  Blood Alcohol Content Evidence

Wise insists that evidence of her blood alcohol content, even if relevant, should nevertheless be excluded for three reasons.

First, she argues that no foundation has been laid for the blood alcohol report generated by Kalispell Regional Medical Center.  Rust counters that he

---

[4]This finding is distinct from the issue of liability addressed below.  Liability turns on whether there is a genuine issue if Rust was the predominant cause of the accident, not whether Wise's negligence might have contributed to her injuries.

"could simply lay the proper foundation . . . at trial by calling the hospital's records custodian and eliciting testimony that would satisfy Fed.R.Evid. 803(6)." Def.'s Br. Opposing Pl.'s Mot. in Limine 11 (dkt #28). Wise is free to object at trial, but there is no reason to evaluate the report's foundation at this time.

Next, Wise argues that her blood alcohol content should be excluded because the test was not performed in accordance "with the Administrative Rules governing the proper procedure for drawing blood." Pl.'s Br. Support Mot. in Limine 3 (dkt #22). Wise's argument is based on Admin. R. Mont. 23.4.220(1), which only applies to blood samples drawn at the written request of a peace officer. The argument is frivolous. Although she submitted to a blood test, it was not at the request of a peace officer. Moreover, even if the Administrative Rule did apply, Wise fails to explain how that would provide a basis to exclude the test result under the Federal Rules of Evidence.

Finally, Wise argues that evidence of her blood alcohol content should be excluded because it is improper and speculative to extrapolate a person's blood alcohol content back to the time of an accident. Wise contends that Rust's own expert admitted that it is improper to do so. Even if he did, it is a question of weight not relevance but such is not the case.

Wise inaccurately represents the toxicologist's testimony. Lynn Kurtz,

Rust's toxicology expert, testified that he could not determine Wise's "exact" blood alcohol content at the time of the accident without knowing certain information, such as exact drinking history, body weight, metabolism, elimination rate, and absorption.  He went on to testify that, in the absence of such information, it is proper to calculate a "range" in which a person's blood alcohol content would fall for a particular time previous to a known blood test.  Here, the toxicologist provided that Wise's blood alcohol level at the time of the accident was somewhere in the range of .220 and .290, and that this determination was subject to a reasonable degree of scientific certainty.  SGI ¶ 43 (dkt #26).  As such, the toxicologist's opinion on Wise's blood alcohol level is not conjecture or speculation but instead based on facts that allow for a reasonably accurate conclusion.  This is admissible evidence to be weighed by the fact finding jury.

### c.  Evidence of Wise's DUI Citation

Wise moves the Court to exclude evidence of the DUI citation issued to her as a result of this accident.  Because the DUI charge has been dismissed, Rust concedes that the citation should be excluded.  This portion of Wise's motion is granted; evidence of the dismissed DUI citation is excluded.

### d.  Trooper Ford's Investigation Report

Wise also moves to exclude any reference to the information contained in

Trooper Ford's investigation report.  Wise takes the broad position that all police

reports are inadmissible pursuant to Fed.R.Evid. 803(8).  Id.  Wise's position is

contrary to the Federal Rules of Evidence.

Under Rule 803(8), reports "setting forth . . . factual findings resulting from

an investigation made pursuant to authority granted by law" are admissible in civil

actions, unless the "sources of information or other circumstances indicate lack of

trustworthiness."  Fed.R.Evid. 803(8)(C).  This rule applies to police reports,

meaning Rule 803(8) does not preclude them.  United States v. Sims, 617 F.2d

1371, 1377 (9th Cir. 1980).  Because Wise seeks exclusion on no other grounds,

there is no reason for the report to be excluded.

### e.  Evidence of Beer Bottles

Wise seeks exclusion of any reference to, or photos of, the beer bottles

found in her vehicle.  Wise argues that the evidence is irrelevant and prejudicial.

In response, Rust argues the evidence is relevant to the issue of Wise's

comparative negligence.  To the extent Wise's intoxication and her ability to

operate the vehicle at the time of the accident are in dispute, the evidence is

relevant.  The evidence may, however, prove to be cumulative or more prejudicial

than probative at trial, depending on the purpose for and context in which the

evidence is offered.  See Fed.R.Evid. 403.  Thus, the motion to exclude evidence

of the beer bottles is denied, subject to renewal at trial.

### 3.  Wise's Motion for Summary Judgment as to Liability

Wise argues that she is entitled to summary judgment on the issue of liability because "Rust was the sole cause of the collision."  Her argument is based on the flawed premise that there is no evidence linking her alcohol consumption with the cause of the accident.  She relies on the testimony of Trooper Ford and Leona McKean, a waitress at Happy's Inn who witnessed the accident.  Id. at 9.  Trooper Ford testified that Rust was the sole cause of the accident and that Wise's alcohol consumption was not a contributing factor.  SUF ¶ 6 (dkt #49).  McKean testified that Wise could not have avoided the collision.  Id. at ¶ 5.  Wise also relies on the expert testimony of Denny Lee, an accident reconstructionist.  In Lee's opinion, Wise's reaction time was below average, but Rust was nonetheless the sole cause of the collision.  Id. at ¶ 7.  In response, Rust argues that a question of fact exists on liability because there is ample evidence showing that Wise's alcohol consumption was a contributing cause of the accident.

Each party misses the issue here.  In Montana, "a plaintiff's contributory negligence may be raised as a defense to a negligence claim."  Larchick v. Diocese of Great Falls-Billings, 208 P.3d 836, ¶ 55 (Mont. 2009).  However, "contributory negligence does not bar a plaintiff from recovering damages if the contributory

14

negligence was not greater than the negligence of the person . . . against whom recovery is sought." Id. Recovery will be barred only if the plaintiff is "more than fifty percent negligent." Id.

Thus, Wise need not show that Rust was the sole cause of the accident to prevail, and Rust needs to do more than simply show there is a genuine issue as to Wise's comparative negligence to avoid summary judgment on liability. Viewing the evidence in Rust's favor, he has failed to create a genuine issue as to his liability.

Rust does not dispute that the evidence shows he was negligent. Instead, he tries to create a genuine issue for trial by arguing Wise was more negligent than him. He offers testimony that Wise's blood alcohol content at the time of the accident was between .220 and .290, and this diminished her ability to perceive and respond to hazards while driving. SGI ¶¶ 43-44.

While Wise's alcohol consumption may have contributed to the accident, based on the summary judgment record there is no genuine issue that her negligence was a greater cause of the accident than Rust's negligence. Leona McKean witnessed the accident and testified that Wise could not have avoided the collision. Denny Lee, the accident reconstructionist, opined that Rust was the sole

15

cause of the collision.[5]  This evidence is uncontested by Rust.  Instead, Rust offers only testimony from his expert that Wise should not have been driving at the time of the accident because she was intoxicated.  But when asked whether Wise could have avoided the collision if she had no alcohol in her system the expert responded:

> I cannot tell you that answer.  And the reason being is because I'm not the accident reconstructionist.  And I don't know at what – what speed [Wise] may have been traveling or anything else and how that played into the fact of her reaction time.

Kurtz Dep. 73:17-22, July 19, 2010 (dkt #14-5).  In other words, the toxicologist offers no evidence that Wise's diminished reaction time was the predominant cause.  He cannot contradict testimony by the eyewitness and the accident reconstructionist that Rust was predominantly at fault for the collision.  Viewed in the light most favorable to Rust, a reasonable jury could not conclude that Wise's drinking was the principle cause of the accident.  Accordingly, Wise is entitled to summary judgment on the issue of Rust's liability.  It will be up to a jury to determine the extent to which Wise's reaction time contributed to her injuries.

## B.   Shoulder Injury

---

[5]Trooper Ford testified that Rust was the sole cause of the accident, but he also indicated in the accident report that Wise's intoxication was a contributing circumstance.  This discrepancy is for the jury to resolve.

### 1. Facts

Wise has a history of shoulder injuries predating the car accident.  In December 2000, Wise dislocated her right shoulder in a fight.  Dr. Clyde Knecht, Wise's physician, first treated her in October 2003 when she reported problems with shoulder dislocations.  Dr. Knecht informed Wise that her shoulder would require surgery in order to prevent further dislocations.  In January 2006, her shoulder was surgically repaired during a procedure known as a Bankart repair.[6] SUF ¶ 16 (dkt #17).  In March 2007, she dislocated her shoulder after slipping on ice.  Id. at ¶ 36.  In June 2007, approximately 11 days before the car accident with Rust, Wise dislocated her shoulder while carrying groceries.  Id. at ¶ 37.

Following the car accident with Rust, Wise's shoulder dislocated more frequently than it had before the accident.  SGI ¶¶ 7-8 (dkt #30).  In July 2007, Dr. Ken Stimpson, an orthopedic surgeon, examined Wise and diagnosed her with "recurrent instability of the right shoulder."  SUF ¶¶ 15-17 (dkt #17).  On July 26, 2007, Dr. Stimpson surgically repaired Wise's shoulder.  Id. at ¶ 22.  During the procedure, Dr. Stimpson found that Wise had a torn labrum and concluded that the Bankart repair in January 2006 had failed.  Id.  In order to repair the labrum, Dr.

---

[6] A "Bankart repair" is a surgical procedure in which a torn anterior labrum is reattached to the anterior part of the glenoid.  A torn labrum is usually the result of a traumatic shoulder dislocation.  See SUF ¶¶ 9-12 (dkt #17).

Stimpson cut the subscapularis tendon so that he could more easily access the shoulder joint.  Id. at ¶ 23.  Once the labrum was repaired, Dr. Stimpson reattached the subscapularis tendon.  Id.  Shortly after the surgery, Wise dislocated her shoulder while getting dressed.  Id. at ¶ 26.  Consequently, Dr. Stimpson performed a second surgery on Wise's shoulder in December 2007.  Id. at ¶ 31.  During the surgery, Dr. Stimpson found that the Bankart repair was stable, but the subscapularis tendon was torn.  Id. at ¶ 32.  According to Dr. Stimpson, some type of trauma is usually required to tear a subscapularis tendon; it does not just fall apart.  Id.  Shortly after the second surgery, Wise slipped in the shower and may have dislocated her shoulder.[7]  Id. at ¶ 35.

In Dr. Stimpson's opinion, Wise's history of shoulder dislocations indicates that her shoulder was unstable before the car accident with Rust.  Id. at ¶ 18.  He testified that Wise likely suffered a torn labrum before the accident because she had "two known" dislocations prior to the accident.  Id. at ¶ 20.  According to Dr. Stimpson, the prior dislocations indicate that the Bankart repair in January 2006 had failed.  Id. at ¶ 18.  He also testified that Wise likely tore her subscapularis tendon when she dislocated her shoulder shortly after the July 2007 surgery.  Id. at

---

[7] Wise is unsure if her shoulder dislocated when she slipped in the shower.  However, it appears that her shoulder sustained at least some level of trauma.

¶ 28.  According to Dr. Stimpson, the initial dislocation following surgery would not have occurred unless Wise put herself into a position that she was not supposed to be in.  Id. at ¶ 26.  Dr. Stimpson testified that Wise missed two scheduled follow-up visits and failed to follow strict post-op protocol for a Bankart repair.  Id. at ¶¶ 25-26.  He also stated that Wise's shoulder condition was likely aggravated by the accident.  Id. at ¶ 21.  When asked whether Wise would have needed the July 2007 surgery if the accident had not occurred, Dr. Stimpson declined to offer an opinion.  Id.  He did, however, testify that if Wise's shoulder was unstable following the January 2006 surgery, it would remain unstable until she had it surgically repaired.  Id.

In March 2010, Dr. Catherine Capps, an orthopedic surgeon, examined Wise.  Id. at ¶ 38.  Based on the examination and her review of Wise's pre- and post-accident medical records, Dr. Capps diagnosed Wise with "recurrent instability of the right shoulder, pre-existing and current."  Id. at ¶ 42.  In Dr. Capps' opinion, Wise's shoulder suffered no significant trauma in the car accident and there is no evidence that the accident caused further damage to her shoulder. Id. at ¶ 44.  According to Dr. Capps, the July 2007 surgery would have been necessary regardless of the car accident.  Id. at ¶ 47.

In July 2010, an MR arthrogram revealed that Wise had re-torn her

19

subscapularis tendon.  Id. at ¶ 48.  In Dr. Capps' opinion, any future surgery to

reattach the tendon would not be related to the car accident with Rust.  Id. at ¶ 49.

The record indicates that Dr. Knecht reviewed the arthrogram results, however, it

is unclear if he reviewed the results in the course of his treatment of Wise or in the

course of this litigation.

Dr. Knecht opined that the car accident aggravated Wise's shoulder

condition.  SGI ¶ 7 (dkt #30).  Specifically, he testified that the accident increased

the frequency of her shoulder dislocations.  Id.  Dr. Knecht's testimony is

supported by the opinion of Dr. Patrick Galvas, a physiatrist.  According to Dr.

Galvas, the car accident aggravated Wise's pre-existing shoulder condition.  Id. at

¶ 14.  Additionally, Dr. Galvas testified that there is "no medically reliable way" to

apportion Wise's shoulder injury between her pre-existing condition and the car

accident with Rust.  Id.  Although Dr. Knecht believed Wise's shoulder required

surgery, he also testified that he does not perform shoulder surgeries and "would

never do a shoulder surgery."  Knecht Dep. 17:22-25, Aug. 12, 2009.  He further

stated that he has never reviewed any of the medical records from Wise's January

2006 surgery and has never heard of a Bankart repair.  Id. at 22:10-23:20.  Dr.

Knecht admitted that the procedure is beyond his area of expertise.  Id. at 23:23.

Dr. Knecht treated Wise in August 2007, approximately seven weeks after

the car accident and two weeks after her second shoulder surgery.  Like the

January 2006 surgery, Dr. Knecht admitted that he did not have any of the medical

records from Wise's second surgery and does not know what surgery was

performed.  He also admitted that he does not know what was done during Wise's

third surgery in December 2007.  He revealed that offering any opinion on Wise's

prognosis for future surgery is "outside of [his] area of expertise."  Id. at 53:3-3.

### 2. Rust's Motion in Limine to Exclude Testimony by Dr. Knecht

Rust moves to exclude Dr. Clyde Knecht from offering opinions on (1)

Wise's right shoulder surgeries, including the injuries repaired during the

surgeries, the types of procedures performed, and the outcome of the procedures;

(2) the prognosis for any future shoulder surgeries Wise may undergo; and (3) the

findings from the MR arthrogram performed on July 8, 2010, including any

opinions concerning the cause of any of the findings on the MR arthrogram.

Rust argues that Dr. Knecht should be prohibited from offering opinions on

these issues because Dr. Knecht has not reviewed the records for the surgeries, he

is unfamiliar with the surgical procedures performed, and he otherwise lacks a

foundation to opine on the surgeries, the potential need for future surgeries, and

the findings from the arthrogram.  In response, Wise takes the broad position that

Dr. Knecht is her treating physician and, as such, he can offer opinions on the

nature of her shoulder condition.

Wise's argument is slightly off base. Rust does not seek to prohibit Dr. Knecht from offering any opinion testimony. Instead, he seeks to limit the scope of Dr. Knecht's testimony. Thus, the question presented is to what extent can Dr. Knecht, as a treating physician, offer opinion testimony on Wise's shoulder surgeries.

Treating physicians are generally not subject to the mandatory expert witness disclosure requirements. Arneson v. Mich. Tissue Bank, 2007 WL 4698986 at *10 (D.Mont. Mar. 26, 2007). To be admissible in the absence of an expert disclosure under Fed.R.Civ.P. 26(a)(2)(B), a treating physician's opinion must be acquired through the treatment of a patient. Id. A "treating physician's opinion on matters such as causation, future treatment, extent of disability and the like are part of the ordinary care of a patient." Id. If properly based on personal knowledge, treatment of the patient, and facts of his or her examination and diagnosis, then a treating physician may give an opinion as to the cause of an injury or degree of the injury in the future. Id.

Here, Dr. Knecht can only testify in his capacity as Wise's treating physician because he was not disclosed as an expert pursuant Fed.R.Civ.P. 26(a)(2)(B). Therefore, he can only offer an opinion if it was acquired through the

treatment of Wise.  In terms of Wise's shoulder surgeries, Dr. Knecht admits that he has not reviewed any of the medical records from the January 2006, July 2007, or December 2007 surgeries and does not know what injuries were repaired or what types of surgeries were performed.  He testified that he is unfamiliar with a "Bankart repair" because it is "orthopedics beyond what [he] know[s]."  Knecht Dep. 23:17-23.  He also stated that he does not perform shoulder surgeries and "would never do a shoulder surgery."  Id. at 17:22-25.  Any opinion of Dr. Knecht regarding Wise's shoulder surgeries would not be based on his personal knowledge and treatment of Wise.  Therefore, Dr. Knecht may not offer any opinions on the injuries repaired during the shoulder surgeries, the types of procedures performed, and the outcome from the procedures.

Dr. Knecht is also precluded from offering an opinion on Wise's prognosis for recovery from any future surgery because, in his own words, that is "outside of [his] area of expertise."  Id. at 53:2-3.

Lastly, in terms of the findings from the arthrogram, Rust argues that, because Dr. Knecht knows nothing about the shoulder surgeries, he lacks the necessary foundation to offer an opinion on the findings from the MR arthrogram, including any opinion on the cause of those findings.  It is unclear what sort of testimony Dr. Knecht would provide based on the arthrogram.  However, his

unfamiliarity with Wise's surgeries deprives him of a foundation to testify as to the relation between the July 2010 arthrogram findings and the June 2007 accident.  Accordingly, Dr. Knecht is precluded from testifying on how the arthrogram's findings relate to the 2007 car accident.

### 3.   Rust's Motion for Summary Judgment Re: Wise's Shoulder Surgeries and Current Shoulder Condition

Rust moves for summary judgment on the issues (1) that his negligence was not the cause of Wise's shoulder surgery in July 2007, (2) that his negligence was not the cause of Wise's shoulder surgery in December 2007, and (3) that his negligence was not the cause of Wise's current shoulder condition, including any need for future surgery.  The motion succeeds in part.

Rust's argument here is narrow.  He is not arguing that Wise did not suffer any shoulder injury in the accident.  In fact, he acknowledges that the accident may have aggravated Wise's pre-existing shoulder condition.  SUF ¶ 21 (dkt #17). Instead, Rust insists that the surgeries in July 2007 and December 2007 were not the result of the car accident.  Id. at ¶ 47.  He argues that Wise's pre-existing shoulder condition necessitated her July 2007 surgery, not the accident.  Id.  He also argues that the car accident is unrelated to the fact that her surgeries were unsuccessful.  Id. at ¶¶ 26-32.  According to Rust, there is no evidence suggesting

the two surgeries failed for any reason other than Wise's own conduct.  Id.
Finally, Rust contends that Wise's current shoulder condition and her need for
future surgery are unrelated to the car accident.  Id. at ¶ 49.

In response, Wise argues that the surgeries were reasonable and necessary
as a result of the aggravation from the collision.  SGI ¶ 12 (dkt #30).  Because the
accident aggravated her pre-existing condition, Wise contends that it is necessary
for a jury to apportion damages between those caused by her pre-existing
condition and those caused by the car accident.  Id. at 6.

Wise's statement of the law is correct.  In Montana, when a pre-existing
injury is aggravated by an accident a jury is responsible for apportioning damages
between those caused by the pre-existing condition and those caused by the
accident.  Callihan v. Burlington Northern Inc., 654 P.2d 972, 976 (Mont. 1982);
Priest v. Taylor, 740 P.2d 648, 651 (Mont. 1987).

Viewing the evidence in a light most favorable to Wise, a genuine issue of
material fact exists regarding Wise's July 2007 surgery.  Although Rust's expert
testified that the July 2007 surgery would have been necessary regardless of the
car accident, three other doctors acknowledged that the accident aggravated
Wise's shoulder condition.  SGI ¶¶ 7, 12, 14 (dkt #30).  According to Wise and her
treating physician, this aggravation resulted in "daily" shoulder dislocations

25

compared to "infrequent" dislocations prior to the accident.  Id. at ¶¶ 7, 8.  A

question of fact exists as to whether Rust's negligence, which aggravated Wise's

shoulder condition, necessitated the July 2007 surgery.[8]  Rust's motion for

summary judgment regarding the July 2007 surgery is denied.

In regard to the December 2007 surgery and Wise's current shoulder

condition, the undisputed facts demonstrate that the December 2007 surgery and

Wise's current shoulder condition were not caused by the car accident.  Dr.

Stimpson testified that the July 2007 surgery was successful and that Wise's

shoulder was stable immediately following the operation.  SUF ¶¶ 23-24 (dkt #17).

Shortly after surgery, Wise dislocated her shoulder while getting dressed.  Id. at ¶

26.  According to Dr. Stimpson, this would only happen if Wise put herself into a

position that she was not supposed to be in.  Id.  On December 18, 2007, Dr.

Stimpson performed a second surgery on Wise's shoulder.  During the operation,

he found that the Bankart repair was stable but the subscapularis tendon was torn.

---

[8]In his reply brief, Rust compares this case to Bancroft v. Mitchell Offshore Marine, LLC, 44 So.3d 711 (La. App. 2010).  There, a Louisiana court found a plaintiff's back surgery was not necessitated by the accident in question after noting the surgeon stated he repaired a pre-existing injury and plaintiff's pre-accident MRI was consistent with his post-accident MRI.  Id. at 717-18.  Here, there are no similar facts.  Wise's surgeon could not say whether the July 2007 surgery would have been needed if Wise was not in the accident.  Nor is there evidence, such as the MRI's in Bancroft, that Wise's shoulder condition was the same before as it was after the accident.  To the contrary, the evidence indicates Wise experienced more frequent dislocations after the accident.

Id. at ¶ 32.  According to Dr. Stimpson, some type of trauma is usually required to tear a subscapularis tendon; it does not just fall apart.  Id.  Dr. Stimpson testified that Wise likely tore the tendon when she first dislocated her shoulder while getting dressed.  Id. at ¶ 28.  Shortly after the second surgery, Wise slipped in the shower and her shoulder sustained some level of trauma.  Id. at ¶ 35.  In March 2010, Dr. Capps examined Wise and diagnosed her with instability of the right shoulder.  Id. at ¶ 42.  In Dr. Capps' opinion, Wise's ongoing shoulder instability is not related to the accident.  Id. at ¶ 45.  In July 2010, an MR arthrogram revealed that Wise had re-torn her subscapularis tendon.  Id. at ¶ 48.  According to Dr. Capps, any future surgery to reattach the tendon would not be related to the car accident.  Id. at ¶ 49.   Based on this evidence, Rust has met his burden of demonstrating the absence of a genuine issue of material fact in regard to the December 2007 surgery and Wise's current shoulder condition.

Wise fails to set forth specific facts showing a genuine issue for trial in regard to the December 2007 surgery and her current shoulder condition.  She presents no evidence that the post-accident surgeries failed for any reason other than her own conduct.  The undisputed facts demonstrate that (1) Dr. Stimpson repaired Wise's shoulder during the July 2007 surgery, (2) Wise was non-compliant with proper post-op protocol, (3) Wise dislocated her shoulder shortly

after surgery because she put herself into a position she was not supposed to be in, and (4) Wise tore her subscapularis tendon when she dislocated her shoulder shortly after the July 2007 surgery.  In the absence of specific facts linking the December 2007 surgery and Wise's current shoulder condition to the car accident with Rust, there is no genuine issue for trial.  Rust is entitled to summary judgment as to the December 2007 surgery and Wise's current shoulder condition, including any need for future surgery.  The motion is otherwise denied.

## C.    <u>Brain Injury</u>

Wise claims she suffered a head injury as a result of the collision.  Compl. ¶ 3.  Rust moves for summary judgment on this injury arguing there is no admissible evidence supporting the allegation.  In response, Wise insists she has testimony from medical providers that she, on a more probable than not basis, suffered a traumatic brain injury.  Rust has it right.

### 1. Facts

At the scene of the accident, Wise was found unconscious.  SGI ¶ 2 (dkt #38).  Two years later, she was examined by Dr. Patrick Galvas, a physical medicine and rehabilitation expert.  <u>Id.</u> at ¶ 3.  Dr. Galvas had concerns that Wise suffered a mild traumatic brain injury, and he referred her to Dr. Mark Johnson for a neuropsychological assessment.  <u>Id.</u>; SUF ¶ 6 (dkt #20).

28

After examining Wise, Dr. Johnson "found her to be functioning in the borderline range with regard to intellectual ability as well as below-average ability with regard to scholastic functioning."  SUF ¶ 7 (dkt #20).  He found that she had "difficulties with visual-spatial ability, language difficulties and abstract reasoning difficulties."  Id.  These findings came with a caveat "about possible lack of consistency and motivation."  Johnson's Report 4 (dkt #20-3).  Dr. Johnson concluded that Wise's "performance may be [] a result of trauma to the head."  Id. at 7.  He could not, however, determine whether that was the case due to "multiple variables"–such as "motivational issues; sleep and pain issues; depression; medication issues; and possible previous injury contribution of visual-spatial processing"– potentially impacting test performance.  Id.  Dr. Johnson recommended "further workup to include ophthalmologic and possibly PET scan data" to identify "what, if any" test results can be attributed to "trauma to the brain."  Id.

After reviewing Dr. Johnson's report, Dr. Galvas testified that neuropsychological testing showed Wise exhibited cognitive disorders but that causation was unclear.  SUF ¶ 10 (dkt #20).  Wise was also examined by Rust's expert, Dr. Capps, who could not say whether Wise suffered a traumatic brain injury as it was beyond her field of expertise.  SGI ¶ 5 (dkt #38).

## 2.  Discussion

The issue here is whether Wise can submit her claim for brain injury

damages to the jury.  Rust contends, through a two-step argument, that she cannot.

First, Rust posits that under Montana law Wise's brain injury claim requires

expert testimony showing that the injury more likely than not was caused by the

accident in question.  The Montana Supreme Court has held that expert testimony

is required to establish causation for injuries when causation is not readily

apparent to a layperson.  See Cain v. Stevenson, 706 P.2d 128, 131 (Mont. 1985);

Morallis v. Lake County, 839 P.2d 1287, 1289 (Mont. 1992).  Rust insists that the

existence and causation of Wise's brain injury is such an issue.  Additionally, Rust

posits that the required expert testimony must show the injury "more likely than

not" resulted from the accident, and that this burden is not met through testimony

that an injury was possibly caused by the accident.  Kramer v. EBI Co.'s, 878 P.2d

266, 270 (Mont. 1994).

Rust then argues Wise lacks such evidence.  Rust highlights, among other

things, that Dr. Johnson and Dr. Galvas could not determine whether Wise

suffered a brain injury as a result of the accident.  SUF ¶¶ 7, 11 (dkt #20).

Wise does not dispute that her brain injury is a complicated issue that

requires admissible expert medical testimony.  Given the record supporting this

motion, there is no reason to think otherwise.  Instead, Wise insists she has met her

burden.  First, she notes that she was knocked unconscious in the accident.  SGI ¶

2 (dkt #38).  Next, she points to Dr. Galvas' "concern" that she suffered a brain

injury.  Id. at ¶ 3.  Finally, Wise offers Dr. Johnson's opinion that she exhibited

symptoms indicative of a closed head injury.[9]  Id. at ¶ 4.

The evidence Wise puts forward falls short of what is required.  She has

failed to identify any medical expert opinion on the causal relationship between

her injury and the accident.  Dr. Galvas' opinion only establishes that he had a

concern that she suffered a brain injury.  This concern instigated her being tested,

but after reviewing the test results, Dr. Galvas found that causation was unclear.

SGI ¶ 5 (dkt #38).  Similarly, while Dr. Johnson opined that Wise exhibited

symptoms of a brain injury, this falls short of medical expert testimony about

causation.  Dr. Johnson withheld an opinion on causation and instead

recommended "further workup" to "elucidat[e] the potential causal contributors"

to her symptoms.  SUF ¶ 7 (dkt #20).  These proofs are insufficient to create a

material issue of fact.  On this proof a jury could only speculate about a brain

---

[9]Wise also notes that Rust's expert, Dr. Capps, could not say whether Wise suffered a
traumatic brain injury.  It is unclear how this is relevant to the issue at hand.  It is Wise's burden
to show she suffered such an injury.  The fact that Rust's expert cannot opine on the matter does
nothing to meet that burden.

injury or its cause.  Without any expert testimony to establish the causation of Wise's alleged brain injury, Rust is entitled to summary judgment on the claim.

## V.  Conclusion

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Plaintiff Wise's Motion in Limine (dkt #21) is GRANTED in part and DENIED in part.  The Motion is granted so as to exclude Plaintiff's DUI citation, and denied in all other respects;

2. Plaintiff Wise's Motion for Summary Judgment as to Liability (dkt #13) is GRANTED;

3. Defendant Rust's Motion in Limine to Exclude Testimony By Dr. Knecht (dkt #23) is GRANTED;

4. Defendant Rust's Motion for Summary Judgement Re: Plaintiff's Shoulder Injury and Shoulder Surgeries is GRANTED in part and DENIED in part (dkt #15).  There is a genuine issue whether Wise's July 2007 surgery was necessitated by the accident.  The Motion is otherwise granted; and

5. Finally, Defendant Rust's Motion for Summary Judgment Re: Traumatic Brain Injury (dkt #18) is GRANTED.

Dated this 30th day of November, 2010.

_____
DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT